CENTRAL CITY ICE WORKS *v.* MAYOR &c. OF MACON.

Under the evidence, a case was made for submission to the jury as
to whether the city was negligent in leaving or keeping the street
in an unsafe condition at the point where the breaking of the
wagon and harness occurred and the horses took fright, and
whether or not there was contributory negligence by the plain-
tiff's servant in attempting, under all the circumstances, to drive
over that part of the street.          *Judgment reversed.*

April 17, 1893.   Argued at the last term.

Action for damages.   Before Judge MILLER.   Bibb
superior court.   November term, 1891.

The nature of the action will appear from the report
of the testimony.   A nonsuit was granted, and plaintiff
excepted.   McKendrick testified: February 16, 1889,
was driving a heavy ice wagon for plaintiffs up Third
street in Macon.   Attempted to cross over the sewer
they had been putting in the street, and as I drove over
the embankment, which looked to be raised about five
inches and left in that way, at a place where it looked
as if other people had been driving, my horses bogged,
made a lunge to get out of the bog, broke everything
loose and jerked me off; as I was unable to handle
them, they ran away and one broke his neck and the
other his leg.   They went down fifteen or eighteen
inches in the excavation as soon as they put their front
feet on where it, was filled up.   I had seen the street
hands working at the crossing on Cherry street.   They
had put a fence all around the crossing on Cherry street,
and the excavation ran along the street.   I could cross
it below where I did, but could not cross it above.   I
was going to a drug-store to deliver ice, and that was
the usual and most direct route over which I had been
going for three or four months.   The excavation was
right in the middle of the street.   The horses were as
gentle as could be.   The ground looked perfectly hard

where I was going to cross, but turned out to be very soft. There was nothing in the street in the way of guard-rails or warning to show that the crossing was dangerous. It did not look like anything had been done to ram the ground, but other people had been crossing the day before it appeared, not that morning. When the horses made the lunge they broke the pin in the doubletree, and the tongue fell down under them; most any horse would run for that, and as they did they pitched me out. The bog caused the horses to plunge. I did all I could to prevent it. Was afraid to cross below because it had sunk down, and came up the street to the hardest looking place I could find. The fence, to the best of my knowledge, ran from where the park was built clear down and came in on the Cherry street crossing. This hole was right in front of Sims' shoe-store, and the fence was above this hole, running up towards the river from where the horses bogged. The hands were taking up the water-pipe and tank put there, and the hole extended all along the way where the fence was, inside the fence. No part of the ditch had been filled up inside the fence; they were working on it then. The excavation had been done two or three days. They were working on that sewer from Third up to Cherry street for about a week. I had been along there within two days, but drove around. They dug this sewer the day before, and the day before that I went up Fourth street and came around Mulberry up to the drug-store; did not go that way this time because I had a customer named Johns; and I came by and gave him his ice and came out the alley to Third street. Coming up this way threw me up Third street to get to the drug-store. There was nothing that I could have done that would have avoided the accident. I had been along by Sims' shoe-store about two days before that. The street was boggy all along down below that place then. I think

it had been filled in at that place I crossed then. ."I cross the last time on Cherry street and turn and go down on Third on this side of the sewer." The ground was wet then. I do not remember how long before this the ditch had been dug, and do not remember how high the dirt was above that ditch the day before. I was driving the wagon then, but did not cross it that day. The ditch had been dug in front of Sims' store, but it was not where I crossed two days before. The sewer came up the middle of the street, and the cistern was right in the middle of Cherry and Third, and they dug up the sewer to that one; on the other side there was nothing dug at all. The sewer ran from Cherry down to Third and Poplar street. I crossed in front of the shoe-store; other people had been crossing, and I did not go up on Third street and cross it there because they had fenced it. They had fenced on one side of the street. I saw buggy-tracks crossing the sewer at this place. It had rained the night before, and was raining at that time. I did not go there the day before at all. Coming down from Johns into Third street, there was no trouble in crossing there, and I could have gone on the other side up Third street. It looked as if other people had been crossing where I went, and I saw the excavation was covered up. The lunge the horses made to get out of the bog broke the tongue. A jerk is worse than a steady pull, and the wagon and load were very heavy.

The manager of the plaintiff corporation testified: Came up shortly after the accident. The front wheels of the wagon were in the ground about five or six inches, and the prints of the horses' legs where they were drawn out were about six or eight inches. This was on Third street just in front of Sims' store, where the sewer had been dug out. The front wheels were in the ground where the excavation had been made and dirt thrown over it. The dirt did not appear to have been tamped

or rammed down at all. It had been raining the night before, and it was washed over. There were some light buggy or wagon tracks—you could see the print of them where it had rained and washed them out. The sewer was dug out right in the center of Cherry and Third streets, and it had been filled in. Right in the center of Cherry street the place was dug out and fenced in, but on the other side on Third street, where the wagon was in the ground, was the only place where a driver could go across; that appeared to be the only safe place where he could cross at that time. There were no warn-ings out, except just above, where a fence was put around the street. On Third street it appeared to be the same all along down, but appeared to be a little sunk in just below there. This place was intended to be crossed, for there was no other place to cross at above. The usual and direct route from Johns to the drug-store was the way he followed. The ground was not hard enough to stand the weight that went over it, and the horses being very heavy went under. The city could have packed it and it would have been impossible to have got into it. The excavation above there, where it had not been filled up, was eight or ten feet deep and three or four feet wide. The wheels of the wagon were six inches in the loose dirt, and the horses' tracks in the dirt were half way to their knees. He might have crossed below this point, but that seemed to be the best place he could cross. He would have had to have gone way down Poplar street to get on the left-hand side of the street if he was coming up. From Johns' bar he would naturally go on the right side; going from Johns' bar he would have had to cross Poplar street in order to have got to the place where the accident occurred. Poplar street runs parallel with Cherry and on the other side of the excavation in Third, on the right-hand side, and on the left-hand side there was abundant width for

anybody to drive. There was no place to cross after passing up the street in order to get to the drug-store, except the place where he did cross on that side of the street.

Two city ordinances were in evidence. One required gas and water companies, under a penalty, immediately after gas-pipes were laid in any of the streets, to cause the excavations made to be graded and levelled with the street's surface, and the dirt covering the pipes to be so pressed and pounded down that injury could not result to persons or vehicles passing over them. The other made it unlawful for any person to tear up, dig into, injure or change any sidewalk or street for any purpose, except upon application to the city engineer, etc.; and provided that when the digging or change should be finished, the sidewalk or street should be, by the person or persons making the excavation or change, put in as good condition as before the work was begun, the city engineer to be judge of the same.

HILL, HARRIS & BIRCH, for plaintiff.
R. W. PATTERSON, for defendant.